IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CUNNINGHAM LINDSEY U.S., INC.,          :
                                        :
                    Plaintiff,          :          Civil Action No.
                                        :
              v.                        :
                                        :
GREGORY RHINEHART and                   :
VERICLAIM, INC.,                        :
                                        :
                    Defendants.         :

## COMPLAINT

NOW COMES Plaintiff Cunningham Lindsey U.S. Inc. ("Cunningham

Lindsey"), by and through its undersigned counsel, and alleges the following:

## NATURE OF THE ACTION

1.     Cunningham Lindsey brings this suit to seek appropriate relief against

its former employee Gregory Rhinehart ("Rhinehart") and his new employer,

Vericlaim, Inc. ("Vericlaim") (collectively, "Defendants").  Cunningham Lindsey

is in the business of claims adjustment and loss management for insurers and large

self-insured clients.  Rhinehart was an Executive General Adjuster in Cunningham

Lindsey's office located in Camp Hill, Pennsylvania.  The Camp Hill office

provided claims adjustment services to a number of major clients of Cunningham

Lindsey.

2.      Prior to September 5, 2013, Rhinehart worked with nine other employees in the International Executive Loss Adjusting ("IELA") division in Cunningham Lindsey's Camp Hill Office (the "Other Cunningham Lindsey Employees").  The Other Cunningham Lindsey Employees were Senior Executive General Adjuster Pat Bonanni ("Bonanni"), office manager and Executive General Adjuster Dale Fohl ("Fohl"), National General Adjuster Scott Bonanni, General Adjuster Joseph Christie, General Adjuster Steve Herr, Adjuster Matthew Miller, General Adjuster James Taleff, and Secretaries Megan Kohler and Carol O'Donnell.[1]

3.      In the months before September 5, 2013, Rhinehart assisted in planning and implementing a scheme intended to transfer improperly to Vericlaim the entire IELA business of Cunningham Lindsey's Camp Hill office.

4.      On September 5, 2013, Rhinehart and the Other Cunningham Lindsey Employees all resigned at the same time, without prior notice, marking the departure of the Camp Hill office's entire IELA division.  Immediately thereafter, Rhinehart and the Other Cunningham Lindsey Employees commenced working for a competitor, Vericlaim, out of two nearby locations, and promptly began to replicate with Vericlaim the business they previously performed for Cunningham

---

[1] Plaintiff and its ultimate parent, CL Acquisitions Holdings Limited, have separately sued Bonanni, Fohl and Vericlaim in the United States District Court for the Middle District of Pennsylvania for the same causes of action arising out of substantially the same set of facts.  *See* Civil Action No. 1:13-CV-2528-CCC.

Lindsey.   By resigning simultaneously and without notice, Rhinehart and the Other Cunningham Lindsey Employees ensured that their departures were coordinated so as to exact maximum harm to Cunningham Lindsey's competitive position and its relationships with numerous important clients serviced by the Camp Hill office.

5.   On information and belief, Rhinehart and the Other Cunningham Lindsey Employees also accessed and copied thousands of Cunningham Lindsey business records; destroyed documents and data stored on equipment issued to them by Cunningham Lindsey; disassembled and rifled through paper files and work product maintained for open client matters and left many such papers strewn on desks, chairs and tabletops of the Camp Hill office; and failed to organize, label or complete such files in the manner and form in which Cunningham Lindsey customarily keeps its files.

6.   Both before and after the mass resignation, Rhinehart and Vericlaim, along with certain others of Rhinehart's Camp Hill colleagues, conspired with and aided and abetted each other to solicit and recruit Cunningham Lindsey employees for the purpose of transferring to Vericlaim the entire IELA business of Cunningham Lindsey's Camp Hill office.  Shortly following the mass resignation, Vericlaim, armed with knowledge obtained from Rhinehart and the Other Cunningham Lindsey Employees, contacted one or more Cunningham Lindsey

clients and several of these clients instructed Cunningham Lindsey to transfer Cunningham Lindsey's project files to Vericlaim.

7.      Rhinehart received from Vericlaim payments above any reasonable compensation he could have secured in the open market,  had his services only, and not the transfer of Cunningham Lindsey's business, been valued by a new employer.  This excess payment represents ill-gotten gains to Rhinehart for his role in unfairly securing for Vericlaim the IELA business of Cunningham Lindsey's Camp Hill office, and not for the engagement of his future services.

8.      By participating in the above scheme, Rhinehart violated his agreement and other legal obligations to Cunningham Lindsey not to use or disclose Cunningham Lindsey's confidential information.  He also violated his agreement and other legal obligations to refrain from soliciting, recruiting or taking actions assisting others to solicit or recruit Cunningham Lindsey's employees to work for a competitor.  Rhinehart acted at all relevant times as an agent for Vericlaim, and Vericlaim otherwise conspired with and participated with Rhinehart in the unlawful scheme described further below.

## PARTIES

A.      **Plaintiff**

9.      Plaintiff Cunningham Lindsey is a Texas corporation with its headquarters and principal place of business in Lewisville, Texas.  Cunningham

Lindsey paid the salary of Rhinehart who was employed at the Camp Hill, Pennsylvania office of Cunningham Lindsey.

B.   **Defendants**

10.   Defendant Rhinehart is a Pennsylvania citizen residing at 47 Bella Vista Drive, Mechanicsburg, PA 17050.  Rhinehart worked as an Executive General Adjuster for Cunningham Lindsey and its predecessor in Camp Hill, Pennsylvania for 18 years until his resignation on September 5, 2013.   Thereafter, Rhinehart commenced working as an Executive General Adjuster for Vericlaim at an office located 1.7 miles from his former Camp Hill office at 4900 Carlisle Pike, Mechanicsburg, Pennsylvania, and at another Vericlaim office located 11.1 miles away from his former Camp Hill office at 4075 Linglestown Road, #206, Harrisburg, Pennsylvania.

11.   Defendant Vericlaim is a Delaware corporation with its principal place of business located at1833 Centre Point Circle, Suite 139, Naperville, Illinois 60563.  Vericlaim is the current employer of Defendant Rhinehart and the Other Cunningham Lindsey Employees.

## JURISDICTION AND VENUE

12.   This court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) and (a)(2), because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of

different states and a citizen of a foreign state.   Jurisdiction also is proper under 18 U.S.C. § 1030(g) and 28 U.S.C. § 1331, as Plaintiff Cunningham Lindsey has asserted a federal claim for Rhinehart's violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030 et. seq.

13.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because the events or omissions giving rise to Plaintiff's claims occurred within the District.  Venue is also proper in this District pursuant to 28 U.S.C. 1391(b)(1) and (b)(2) because Rhinehart is a resident of the District and a substantial part of the events giving rise to the claim occurred in the District.

## STATEMENT OF FACTS

### A.   Cunningham Lindsey's Loss Adjustment and Claims Management Business

14.   Cunningham Lindsey is a leading provider of independent loss adjusting and claims management services worldwide.  In addition to its core loss adjusting services, Cunningham Lindsey provides engineering consultancy, risk management, risk survey, environmental remediation consultancy, valuation and related services as well as employee training solutions for its clients in the United States.

15.   Cunningham Lindsey's primary business objective is to investigate and adjust insurance claims as directed by clients.  Its clients are major domestic and international insurance carriers and major self-insured corporations.

16.     Clients are referred to Cunningham Lindsey by word-of-mouth and reputation in the industry.

17.     Cunningham Lindsey has cultivated long-term relationships with, and reasonably expects to continue receiving referrals from, its existing clients and other referring sources.

18.     Cunningham Lindsey employs Adjusters, General Adjusters, National Adjusters and Executive General Adjusters (collectively "Adjusters"). Cunningham Lindsey pays its Adjusters a base salary and provides an incentive bonus opportunity.   In general, the incentive bonus opportunity is set forth in a written plan.  This incentive bonus plan is a based on the level of billings and various percentages are used at different levels of billings.

19.     Over the years, Cunningham Lindsey has developed and maintained a unique program designed to assist insurers and other major companies who suffer major losses covered by property and casualty insurance.  In order to develop a long term relationship of trust and confidence with its clients, Cunningham Lindsey seeks to assign the same Adjuster to all of the client's losses requiring adjustment.  In this way, Cunningham Lindsey not only ensures consistency of service and attention to each client's unique needs, but over time develops goodwill with its clients.  Cunningham Lindsey also fosters strong client relationships by reimbursing Adjusters for expenses incurred for travel and client

entertainment.  These practices foster frequent interaction with clients, further developing the goodwill of its business.

20.     Cunningham Lindsey's practice is to provide clients the comfort that they are receiving a consistent level and quality service by assigning the same Adjuster to the clients' various engagements.  The client is always given the freedom to choose which Adjuster it wishes to use in order to achieve its business objectives.

21.     Rhinehart was an Executive General Adjuster and, therefore, through Cunningham Lindsey's business referrals, maintained exclusive working relationships with several of Cunningham Lindsey's clients.

22.     Because clients generally form long term relationships with their major claims adjusters, Cunningham Lindsey reasonably expects that clients who have engaged Cunningham Lindsey for many assignments over a period of years will continue to accept its services so long as its services continue to be maintained at a high level of quality.

23.     Cunningham Lindsey's profits are derived from the fees it charges the client, minus administrative salaries and costs, taxes, benefits, insurance, and other expenses.

24.     Cunningham Lindsey's success is directly linked to its continuing relationships with its clients.

25.     Vericlaim is a competitor of Cunningham Lindsey in the loss adjustment and claims management business.

B.     **Cunningham Lindsey's Confidential Information**

26.     The companies using Cunningham Lindsey's claims adjustment services are the clients of Cunningham Lindsey and not of the employees of any particular office of Cunningham Lindsey.

27.     Cunningham Lindsey maintains information regarding its clients which is not publicly available, and cannot be assembled from publicly available information.  Cunningham Lindsey's Confidential Information includes information regarding the client's key contact persons, its pricing and discounting preferences and tolerances, its insurance policies, its insureds, pending projects and proposals, claims experience, sales and marketing strategies, revenues, compensation and personnel information and other non-public, business information (collectively "Confidential Information").

28.     Cunningham Lindsey has devoted many years to developing its Confidential Information.

29.     Cunningham Lindsey's Confidential Information helps Cunningham Lindsey and its employees to develop close and trusted business relationships with clients.  By using its Confidential Information, Cunningham Lindsey is uniquely

positioned to service such clients at the highest levels and to attract new assignments and referrals for its services.

30.     Cunningham Lindsey scrupulously guards the confidentiality of its Confidential Information.  For example, access to Confidential Information stored on company computers and other devices is strictly limited to the Cunningham Lindsey employees who need particular Confidential Information to perform their job functions.  This Confidential Information may be retrieved solely through the use of a coded password assigned to Cunningham Lindsey employees.

31.     Cunningham Lindsey also maintains paper files containing Confidential Information.  Cunningham Lindsey employees are required to maintain the confidentiality of such paper files by keeping them in secure file drawers or locked offices accessible only to other employees in the office.   Such paper files include work product the Adjusters prepare for clients including reports, spreadsheets and other documents created for specific projects.  The work product in these files is extremely valuable to Cunningham Lindsey and to its clients who engage Cunningham Lindsey to produce such work product.

32.     Cunningham Lindsey Adjusters have access to pricing and revenue information only of clients they service.  Access to pricing and revenue information for other clients is limited to certain Senior Executives and members of the Finance Department who have a need to have access to such data.

33.     As an added layer of protection, Cunningham Lindsey requires employees to execute confidentiality agreements which, *inter alia*, are designed to protect Cunningham Lindsey against the disclosure of Confidential Information by its current or former employees.

34.     In addition, it is and was Cunningham Lindsey's policy not to permit employees to remove Confidential Information from Cunningham Lindsey offices, except to the extent necessary for an employee to perform his or her job responsibilities.

C.    **The Letter Agreements**

(i)    **Greg Rhinehart**

35.     By letter dated January 1, 2011 (the "Rhinehart Letter Agreement"), Cunningham Lindsey extended Rhinehart a written offer of employment for the position of Executive General Adjuster.  Rhinehart signed the Rhinehart Letter Agreement on January 6, 2011, and thereby agreed to a number of terms and conditions set forth in the Rhinehart Letter Agreement.  A copy of the Rhinehart Letter Agreement is annexed hereto as Exhibit A.

36.     The Rhinehart Letter Agreement, includes the following term under the heading "Confidential Information":

> By accepting employment with Cunningham Lindsey, you agree to the following:  At all times, both during and after termination of employment, I shall keep and retain in confidence and shall not disclose, except as required in the course of my employment with the

Company, to any person, firm or corporation, or use for my own purposes, any Confidential Information.  For purposes of this paragraph, such information shall include, but is not limited to: material, data, and information of the Company and/or its customers or clients that is confidential, proprietary and/or a trade secret.

37.    The Rhinehart Letter Agreement also contains a non-solicitation

agreement, which provides:

By accepting employment with Cunningham Lindsey, you agree to the following:  While employed by Cunningham Lindsey, and for one year after termination of my employment for whatever reason, I will not directly or indirectly solicit or recruit, nor take any action to assist any other person to solicit or recruit for employment, any employee of Cunningham Lindsey.  Such assistance includes, without limitation, identifying employees of Cunningham Lindsey who have special knowledge of the trade secrets and/or business of Cunningham Lindsey.  Because damages for violation of this provision would be difficult to measure, the parties mutually agree that if I violate this provision, I will be liable for liquidated damages in an amount equal to the annual salary of any employee as to whom I am proven to have violated this paragraph.

38.    As an Executive General Adjuster, Rhinehart's primary responsibility

for Cunningham Lindsey was to continue to service the clients he previously had

serviced and developed throughout his tenure.

39.    Rhinehart used the title "Executive General Adjuster" to convey to

clients and his colleagues his leadership position in the Camp Hill office.

40.    In connection with the signing of the Rhinehart Letter Agreement,

Rhinehart assumed his responsibilities as an Executive General Adjuster at the

Camp Hill office on a full-time basis.  He maintained that position and his

responsibilities for that position through the time of his resignation on September 5, 2013.

41.     As a result of his responsibilities as Executive General Adjuster, Rhinehart had full access to all of the Confidential Information maintained in the business records of the Camp Hill office.

### (ii)     **The Other Cunningham Lindsey Employees**

42.     Each of the Other Cunningham Lindsey Employees was a party to a Letter Agreement containing confidentiality and non-solicitation agreements identical to those of Rhinehart.

43.     In connection with the signing of their Letter Agreements, each of the Other Cunningham Lindsey Employees assumed responsibilities at the Camp Hill office on a full-time basis.  They maintained their positions and responsibilities for their respective positions through the time of their mass resignations on September 5, 2013.

44.     As a result of their responsibilities, each of the Other Cunningham Lindsey Employees had full access to Confidential Information maintained in the business records of the Camp Hill office.

### D.     **Orchestrating the Move to Vericlaim**

45.     Vericlaim worked through Rhinehart to contact and solicit the Other Cunningham Lindsey Employees.

46.     Sometime after July 4, 2013, Rhinehart received a call from Vericlaim's Chief Operating Officer, Thomas Simoncic ("Simoncic"), requesting a July 30, 2013 meeting with him to discuss the possibility of going to work for Vericlaim.  Rhinehart informed Bonanni about the call from Simoncic, and Bonanni relayed the information to Fohl and Scott Bonanni, Bonanni's son.

47.     Rhinehart, Bonanni, Fohl and Scott Bonanni all attended the July 30, 2013 meeting, during which Cunningham Lindsey Confidential Information was disclosed to Simoncic, including the salary and bonus arrangements of Rhinehart and the Other Cunningham Lindsey Employees, the total annual production of the entire Camp Hill office and individual adjusters, and the names of the largest clients served by the Camp Hill office.

48.      On August 7, 2013, one week after the July 30, 2013 meeting, Simoncic emailed Rhinehart a document via Rhinehart's wife's email address entitled "Camp Hill Valuation Structure," which projected the revenues and costs of running the Camp Hill Office based on the information disclosed to Simoncic during the July 30 meeting.

49.     On August 9, 2013, Rhinehart sent Simoncic several questions on behalf of himself and the Other Cunningham Lindsey Employees regarding the details of the possible move to Vericlaim.  When Rhinehart received answers to those questions, he sent them to Bonanni.

50.     Rhinehart, together with Bonanni, Fohl and Scott Bonanni, jointly negotiated their own employment arrangements with Vericlaim, including up-front compensation.

51.     Rhinehart also assisted in soliciting for employment with Vericlaim members of the Other Cunningham Lindsey Employees other than Bonanni, Fohl and Scott Bonanni, including Joseph Christie, James Taleff, Steve Herr, Matt Miller, Carol O'Donnell and Megan Kohler.

E.      **Planning and Preparing for the Mass Resignation of Ten Cunningham Lindsey Employees from the Camp Hill Office on September 5, 2013**

52.     Defendants had been planning and preparing for the departures of Rhinehart and the Other Cunningham Lindsey Employees at least as early as the months of July and August 2013.

53.     Although Rhinehart had numerous conversations with members of senior management of Cunningham Lindsey during the months of July and August 2013, at no time prior to September 5, 2013 did he notify Cunningham Lindsey that he was in discussions with Vericlaim or that he and/or the Other Cunningham Lindsey Employees were planning to resign from their positions at Cunningham Lindsey.

54.     While they were still employed by Cunningham Lindsey, Rhinehart and the Other Cunningham Lindsey Employees agreed, and assisted each other, to engage in a pattern of activity reflecting that they were preparing to leave

15

Cunningham Lindsey, to take Cunningham Lindsey Confidential Information with them to use in competition for the benefit of a competitor, and to transition to Vericlaim client files then handled by Cunningham Lindsey's Camp Hill office.

55.     During these months, Rhinehart and the Other Cunningham Lindsey Employees prepared and delivered interim invoices for ongoing work performed for clients of Cunningham Lindsey.  These interim invoices appear to have been delivered as part of an effort to facilitate clients to transition their ongoing work from Cunningham Lindsey to Vericlaim.

56.     In the waning days of his employment with Cunningham Lindsey, Rhinehart, or someone else under his direction or approval or with his knowledge, accessed a significant number of Cunningham Lindsey documents stored on the laptop computer Cunningham Lindsey issued to Rhinehart for business purposes.

57.     These file accesses are by their nature consistent with a user that has the intention of transferring data and not merely viewing or deleting it.

58.     Further, on information and belief, Rhinehart, or someone else under his direction or approval or with his knowledge, deliberately copied, printed and/or otherwise accessed a significant amount of files containing Cunningham Lindsey Confidential Information in the days immediately preceding Rhinehart's resignation on September 5, 2013.  Rhinehart, or someone under his direction or

approval or with his knowledge, also deleted Cunningham Lindsey's documents and data.

59.    On information and belief, Rhinehart assisted or was otherwise involved in printing and/or copying files containing Cunningham Lindsey Confidential Information during the period immediately preceding the mass resignation.

60.    On information and belief, this massive printing and/or copying of files containing Confidential Information was done either for the purpose of preparing client files to be transferred to Vericlaim following the mass resignation of Rhinehart and the Other Cunningham Lindsey Employees or for the purpose of their misappropriation and removal from Cunningham Lindsey's office.

61.    Such massive printing and/or copying of files containing Confidential Information was not done for valid business purposes on behalf of Cunningham Lindsey, but for the personal benefit of Rhinehart and the Other Cunningham Lindsey Employees and/or for the benefit of Vericlaim.  In the ordinary course of business on behalf of Cunningham Lindsey, Rhinehart and the Other Cunningham Lindsey Employees had no valid reason to access this number or volume of documents.

62.    The count of emails sent by the Camp Hill office scanner likewise demonstrates an inordinate amount of scanning of Cunningham Lindsey business

records on August 29, September 4 and September 5.  The volume of scanning

activity on these dates greatly exceeds the volume of scanning undertaken on the

office scanner in the ordinary course of business during the immediately preceding

months.

63.     Upon his departure, Rhinehart returned to Cunningham Lindsey an

iPhone issued to him by Cunningham Lindsey for business use, but he deliberately

locked the device and refused to share the password, preventing Cunningham

Lindsey from gaining access to its contents.

F.     **Rhinehart and the Other Cunningham Lindsey Employees' Resignations**

64.     On September 5, 2013 at 4:46p.m., Rhinehart emailed Jim Girard,

CEO of Cunningham Lindsey, with a resignation letter in which he informed

Girard of his "immediate resignation from Cunningham Lindsey effective at 5PM

EST" that same day to pursue "another opportunity within the industry."

65.     The Other Cunningham Lindsey Employees all resigned in the same

manner and at virtually the same time as Rhinehart on September 5, 2013.  By

example, Bonanni emailed Girard his resignation 1 minute after Rhinehart's email;

Fohl emailed Girard his resignation 2 minutes after Rhinehart's email; and Scott

Bonanni emailed Girard his resignation 1 second before Rhinehart's email.

G.     **Rhinehart and the Other Cunningham Lindsey Employees Left
       Cunningham Lindsey Client Files in Disarray, Further Hindering
       Cunningham Lindsey's Ability to Conduct its Business**

66.     Rhinehart and the Other Cunningham Lindsey Employees notified

Cunningham Lindsey of their resignations after 4:00 p.m. on Thursday, September

5, 2013.  The soonest Cunningham Lindsey could reasonably dispatch a team to

the Camp Hill office to do damage control was Tuesday, September 10.

67.     Upon arrival at the office, those tasked to assess the state of the office

found the office in complete shambles.  They found client files in disarray on

desks, chairs, credenzas, in drawers and on the floor.

68.     In the ordinary course of business, Cunningham Lindsey Adjusters

maintain orderly files that would reflect work product, handwritten notes,

calendars, photographs and other documents needed to handle client needs.  The

files would contain original documents and would be labeled and maintained in

chronological order.

69.     The files discovered in Camp Hill were left in complete disarray.

They were not labeled or organized with identifying information.

70.     The state of the client files as discovered in the Camp Hill office

further demonstrates Defendants' apparent scheme to hinder Cunningham

Lindsey's ability to transition client matters to other Cunningham Lindsey

Adjusters.

H.     **The Scheme To Divert Cunningham Lindsey Clients To Vericlaim**

71.     Weeks before the mass resignation by Rhinehart and the Other Cunningham Lindsey Employees, with the advance knowledge of the date and time of the planned resignations, Vericlaim made arrangements to meet with at least one client of Cunningham Lindsey serviced by the Camp Hill Employees.

72.      On information and belief, this meeting was timed to occur shortly after September 5, 2013, a time that Vericlaim had advance knowledge would shortly follow the mass resignations of Rhinehart and the Other Cunningham Lindsey Employees.

73.     Within a matter of days after the mass resignation on September 5, after being solicited by Rhinehart and the Other Cunningham Lindsey Employees in their new roles as Vericlaim employees, a number of Cunningham Lindsey clients instructed Cunningham Lindsey to transfer their open files to Vericlaim.

74.     Because no Adjusters remained in Cunningham Lindsey's Camp Hill office after the mass resignation on September 5 who had knowledge of Rhinehart's or the Other Cunningham Lindsey Employees' open matters, Rhinehart and the Other Cunningham Lindsey Employees left Cunningham Lindsey's clients with little choice but to request that their open matters be transferred to Vericlaim.  To have done otherwise would have resulted in

inefficiency and duplication of effort for these Cunningham Lindsey clients, costs these clients should not have had to bear.

75.     The timing and circumstances of the simultaneous departures of Rhinehart and the Other Cunningham Lindsey Employees provided insufficient time for Cunningham Lindsey to prepare for and transition these open files to other qualified Adjusters.

76.     Rhinehart and the Other Cunningham Lindsey Employees' duty of loyalty to Cunningham Lindsey and fundamental fairness should have caused them to provide at least some advance notice to Cunningham Lindsey and to assist in the transition of these open matters to other Cunningham Lindsey Adjusters before their sudden, simultaneous departures.

77.     Through their conduct outlined above, Defendants participated in a scheme to cripple Cunningham Lindsey's Camp Hill office, take Cunningham Lindsey Confidential Information, and divert client relationships to Vericlaim. Through the conduct outlined above, Defendants also participated in a much larger scheme to maliciously destroy discrete lines of business being conducted by Cunningham Lindsey and in taking rather than earning the business of clients being serviced by Cunningham Lindsey.  This conduct constitutes unfair trade practices by Defendants.

78.     Fohl admitted to Cunningham Lindsey's CEO, Jim Girard, that Simoncic, Vericlaim's Chief Operating Officer, had instructed Rhinehart and the Other Cunningham Lindsey Employees to resign simultaneously and without notifying Cunningham Lindsey.

79.     No rational or valid business purpose was served by Simoncic's instruction other than to harm Cunningham Lindsey's business relationships and destroy the business previously conducted from Cunningham Lindsey's Camp Hill office.

I.     **Notification To Defendants of the Requirements of the Letter Agreements**

80.     Cunningham Lindsey, through its counsel, notified the Defendants of the terms of the confidentiality and non-solicitation obligations under the Letter Agreements of Rhinehart and the Other Cunningham Lindsey Employees by letters dated September 17, 2013, and that Cunningham Lindsey had discovered evidence indicating their violation of these Letter Agreements.

81.     In the same letters, Cunningham Lindsey further notified the Defendants that their aid and participation in the mass resignations on September 5, 2013, without notice resulted in improper disclosure and use of confidential information belonging to Cunningham Lindsey, and breached the legal duties to Cunningham Lindsey of Rhinehart and the Other Cunningham Lindsey Employees.

82.     Even aside from such formal notification, Rhinehart knew or should have known that his conduct violated his legal duties to Cunningham Lindsey.

83.     In response, counsel for Defendants did not deny that Rhinehart and the Other Cunningham Lindsey Employees planned and coordinated their mass resignations, but nevertheless sought to justify their conduct by stating that these individuals "made their own independent decision to leave Cunningham Lindsey and join Vericlaim."

84.     The purported independence of their "decisions" is beside the point given that they had all agreed that they would not "directly or indirectly solicit or recruit, nor take any action to assist any other person to solicit or recruit for employment, any employee of Cunningham Lindsey."  By participating in the scheme to resign simultaneously and without notice, Rhinehart and Vericlaim both participated in and aided each other in the violation of the Letter Agreements of Rhinehart and the Other Cunningham Lindsey Employees.

## COUNT I

**Breach of Contract -
Violation of Confidentiality and Non-Solicitation Covenants
(against Rhinehart)**

85.     The averments of paragraphs 1 through 84 hereof are incorporated herein by reference as if set forth in their entirety.

86.     Rhinehart entered into a Letter Agreement in which he agreed not to use or disclose Cunningham Lindsey's Confidential Information, and not to recruit, solicit or assist others in the recruitment or solicitation of Cunningham Lindsey employees.

87.     This Letter Agreement was executed in connection with Rhinehart's initial hiring at Cunningham Lindsey.

88.     The restrictions contained in this agreement are reasonably necessary for the protection of Cunningham Lindsey and are reasonably limited in time and scope.

89.     Rhinehart violated his Letter Agreement, as set forth in detail above, by appropriating, using and/or disclosing confidential information for his own purposes and to the detriment of Cunningham Lindsey, by planning to and then joining a competitor, Vericlaim, and by recruiting, soliciting or aiding in the recruitment and solicitation of the Other Cunningham Lindsey Employees.

90.     As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to harm.

## COUNT II

### Breach of Fiduciary Duty
### (against Rhinehart)

91.     The averments of paragraphs 1 through 90 hereof are incorporated herein by reference as if set forth in their entirety.

92.     Rhinehart, by virtue of his employment by Cunningham Lindsey, owed Cunningham Lindsey a fiduciary duty not to act in a manner inconsistent with the interests of their employer, Cunningham Lindsey.

93.     As set forth above, Rhinehart breached his fiduciary duties to his employer Cunningham Lindsey by planning and participating in and failing to disclose the scheme whereby he and the Other Cunningham Lindsey Employees would resign simultaneously and without notice to Cunningham Lindsey.

94.     Rhinehart also breached his fiduciary duties by his, or directing others in, copying, printing, and/or destruction of records containing Confidential Information at Cunningham Lindsey's Camp Hill office, and otherwise using or disclosing information which was relevant to the affairs entrusted to Rhinehart which Cunningham Lindsey would have desired to retain as confidential and for its own use.

95.     The above activities were intended to hinder Cunningham Lindsey's ability to transition client projects to new adjusters, and to facilitate transferring the business of these clients to Vericlaim.

96.     On information and belief, Rhinehart engaged in other pre-selling activities for Vericlaim while he was still employed by Cunningham Lindsey.

97.     After his departure from Cunningham Lindsey, on information and belief, Rhinehart has taken steps to build upon and continue the scheme by

assisting Vericlaim in soliciting clients of Cunningham Lindsey to terminate their relationships with Cunningham Lindsey and to commence working with Vericlaim.

98.    As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to suffer harm.

## COUNT III

**Aiding and Abetting Breach of Fiduciary Duty
(against both Defendants)**

99.    The averments of paragraphs 1 through 98 hereof are incorporated herein by reference as if set forth in their entirety.

100.    Vericlaim knew of the breaches of fiduciary duty in which Rhinehart and the Other Cunningham Lindsey Employees engaged, and Rhinehart knew of the breaches of fiduciary duty in which he and the Other Cunningham Lindsey Employees engaged.

101.    Rhinehart substantially assisted and/or encouraged such breaches of fiduciary duty by encouraging the Other Cunningham Lindsey Employees to leave Cunningham Lindsey's employ simultaneously and without notice, and otherwise to participate in the schemes described above.

102.    Vericlaim substantially assisted and/or encouraged the breaches of fiduciary duty by Rhinehart and the Other Cunningham Lindsey Employees by encouraging them to leave Cunningham Lindsey without notice, and assisting them

in making arrangements for accepting the diversion of Cunningham Lindsey clients.

103.   By virtue of the foregoing, Vericlaim aided and abetted the breaches of fiduciary duty by Rhinehart and the Other Cunningham Lindsey Employees, and Rhinehart aided and abetted the breaches of fiduciary duty by the Other Cunningham Lindsey Employees.

104.   As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to suffer harm.

## COUNT IV

**Misappropriation and Misuse of
Trade Secrets and Confidential Information
Pennsylvania Uniform Trade Secrets Act 12 Pa.C.S. § 5301 et seq. ("PUTSA")
(against both Defendants)**

105.   The averments of paragraphs 1 through 104 hereof are incorporated herein by reference as if set forth in their entirety.

106.   The books, files, and records of Cunningham Lindsey, and especially the data pertaining to Cunningham Lindsey's clients, including information regarding the client's key contact persons, its pricing and discounting preferences and tolerances, its insurance policies, its insureds, pending projects and proposals, claims experience, sales and marketing strategies, revenues, compensation and personnel information and other non-public, business information are highly confidential.

107.   This information derives independent economic value by not being accessible, through proper means, to competitors such as Vericlaim, which can profit from its use or disclosure.  The identities of Cunningham Lindsey's clients, as well as other Confidential Information, are not readily available to the public or to Cunningham Lindsey's competitors. Cunningham Lindsey has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

108.   Cunningham Lindsey has taken more than adequate measures under the circumstances to maintain the secrecy and the confidential and proprietary nature of these trade secrets, including without limitation by requiring employees with access to such information to sign confidentiality agreements, such as the Letter Agreements signed by Rhinehart and the Other Cunningham Lindsey Employees, and to acknowledge their obligation to keep such information confidential, restricting access to such information on a need-to-know basis, and maintaining the files in a secure building and on computer systems that are password-protected.

109.   Additionally, by virtue of his employment by Cunningham Lindsey, Rhinehart had a duty not to reveal confidential information obtained during his employment by Cunningham Lindsey or to use such confidential information for his own benefit and to the detriment of Cunningham Lindsey.

110.    By virtue of Cunningham Lindsey's development and ownership of its Confidential Information, Cunningham Lindsey is entitled to the exclusive use and enjoyment of this information.

111.    The Confidential Information of Cunningham Lindsey was communicated to Rhinehart while he was employed in a position of trust and confidence.

112.    By engaging in the conduct described above, Rhinehart has intentionally, willfully and maliciously misappropriated, misused, revealed and disclosed trade secrets and/or confidential or proprietary information or knowledge of Cunningham Lindsey, and continue and will continue to do so, in violation of a confidential relationship between the Rhinehart and Cunningham Lindsey.

113.    On information and belief, Vericlaim either accepted such information with the knowledge that it was Confidential Information taken by Rhinehart and/or the Other Cunningham Lindsey Employees from Cunningham Lindsey in violation of their duty of confidentiality, or Vericlaim was deliberately indifferent or reckless in failing to prevent Rhinehart and the Other Cunningham Lindsey Employees from using, disclosing or misappropriating Cunningham Lindsey's Confidential Information.

114.    As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to suffer harm.

## COUNT V

### Tortious Interference With Existing and
### Prospective Contractual and Business Relationships
### (against both Defendants)

115.   The averments of paragraphs 1 through 114 hereof are incorporated

herein by reference as if set forth in their entirety.

116.   The Defendants, improperly and without privilege or justification,

have engaged and, upon information and belief, are continuing to engage in the

enticement and solicitation of Cunningham Lindsey's clients and employees, and

have unlawfully interfered and intend to continue to interfere with Cunningham

Lindsey's existing and prospective contractual and business relationships with

clients and employees.

117.   Defendants participated in, approved and/or acquiesced in, *inter alia*,

the misappropriation of Cunningham Lindsey's trade secrets and Defendants'

schemes to compete unfairly with Cunningham Lindsey and to tortiously interfere

with Cunningham Lindsey's contractual and business relationships.

118.   Defendants have also unlawfully induced employees of Cunningham

Lindsey to leave Cunningham Lindsey for the purpose of crippling and destroying

Cunningham Lindsey, or for the purpose of having such employees or former

employees breach their employment agreements with Cunningham Lindsey, and/or

commit other wrongs, such as disclosing, misappropriating or using trade secrets

and/or confidential or proprietary information or knowledge or enticing away

clients of Cunningham Lindsey.

119.   The foregoing conduct was and is willful, intentional and calculated to

cause damage to Cunningham Lindsey, and has already caused and will continue to

cause serious damage to Cunningham Lindsey with respect to its contractual and

business relationships with its clients and employees.

120.    As a consequence of the foregoing, Cunningham Lindsey has

suffered and will continue to suffer irreparable harm and loss.

## COUNT VI

### Civil Conspiracy
### (against both Defendants)

121.   The averments of paragraph 1 through 120 hereof are incorporated

herein by reference as if set forth in their entirety.

122.   By engaging in the conduct described, Rhinehart and Vericlaim

intentionally and willfully entered into an agreement in combination and

conspiracy:

   a.    with the intent to misappropriate Cunningham Lindsey's clients,
         employees, trade secrets and confidential and proprietary information;
         with the intent to interfere with Cunningham Lindsey's contractual or
         prospective business relations with its clients and employees; with the
         intent to unfairly compete with Cunningham Lindsey; and/or with the
         intent to aid or abet a breach of fiduciary duty owed to Cunningham
         Lindsey; and/or

   b.    with the intent to perform various acts to injure Cunningham Lindsey
         in order to develop and advance the business interests of Defendants

and to harm the business interests of Cunningham Lindsey, in violation of state law.

123.   As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to suffer harm.

## COUNT VII

**Unfair Competition**
**(against both Defendants)**

124.   The averments of paragraphs 1 through 123 hereof are incorporated herein by reference as if the same were set forth in their entirety.

125.   By engaging in the conduct described, Defendants have unlawfully and without privilege engaged in unfair competition with and to the detriment of Cunningham Lindsey.

126.   As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to suffer harm.

## COUNT VIII

**Unjust Enrichment**
**(against both Defendants)**

127.   The averments of paragraph 1 through 126 hereof are incorporated herein by reference as if set forth in their entirety.

128.   As a result of Defendants' conduct as set forth above, Cunningham Lindsey has suffered a detriment and Defendants have received and appreciated benefits to which they would not otherwise be entitled.

129.   Under the circumstances, the Defendants' acceptance and retention of such benefits without payment of value to Cunningham Lindsey is inequitable.

130.   Therefore, as a result of their conduct as set forth above, Defendants have been unjustly enriched by the receipt and appreciation of benefits resulting from the diversion of Confidential Information, clients and employees from Cunningham Lindsey to Defendants.

131.   As a consequence of the foregoing, Cunningham Lindsey has suffered and will continue to suffer harm.

## COUNT IX

### Violation of the Computer Fraud and Abuse Act
### (against Rhinehart)

132.   The averments of paragraph 1 through 131 hereof are incorporated herein by reference as if set forth in their entirety.

133.   The actions of Rhinehart as described above constitute violations of one or more provisions of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

134.   The CFAA provides, in relevant part:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses  (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation

involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

18 U.S.C. § 1030(g).

135.   The "factor" described in Subsection (c)(4)(A)(i)(I) is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

136.   "Loss" is defined in the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

137.   By intentionally accessing, obtaining, deleting and/or destroying data and information on Cunningham Lindsey's protected computers without authorization or in excess of their authorization and/or by directing or approving others to do the same, Rhinehart caused loss in excess of $5,000 in value.

138.   Cunningham Lindsey incurred substantial loss in responding to Rhinehart's violations of the CFAA, including conducting a damage assessment and restoring the data Rhinehart accessed, obtained, deleted and/ or destroyed to its condition prior to the their violations.

139.    On information and belief, Cunningham Lindsey has incurred and continues to incur lost revenue and other consequential damages because of the interruption of service resulting from Rhinehart's conduct.

## Prayer for Relief

WHEREFORE, Plaintiff Cunningham Lindsey prays that:

1.    Plaintiff be granted an accounting compelling Defendants to account for all profits, compensation, remunerations and/or benefits obtained as a result of engaging in the aforementioned conduct, including but not limited to:

      a.    breaching and/or inducing the breach of confidentiality, noncompetition, and/or non-solicitation agreements entered into between Rhinehart and Cunningham Lindsey;

      b.    breaching and/or aiding, abetting, or inducing the breach of the fiduciary duty owed to Cunningham Lindsey by Rhinehart;

      c.    misappropriating, revealing and/or disclosing Cunningham Lindsey's trade secrets and/or confidential or proprietary information;

      d.    intentionally interfering with Cunningham Lindsey's existing or prospective contractual and business relationships;

      e.    intentionally and willfully entering into an agreement in combination and conspiracy with the intent to commit various tortious acts or with the intent to perform various acts to injure Cunningham Lindsey in order to develop and advance the business interest of Defendants and to harm the business interests of Cunningham Lindsey; and

      f.    unfairly competing with Cunningham Lindsey to its detriment; and

2.      Plaintiff be awarded damages from the Defendants, jointly and

severally, including:

        a.      compensatory damages in an amount in excess of $75,000;

        b.      liquidated damages in an amount equal to the sum of the annual salaries of each employee as to whom Rhinehart recruited, solicited or assisted any other person to recruit or solicit;

        c.      punitive and/or exemplary damages on all common law claims and as permitted by statute;

        d.      pre-judgment and post-judgment interest in an amount to be determined at trial; and

        e.      the costs and attorney's fees incurred by Cunningham Lindsey in bringing this action;

3.      Plaintiff be awarded damages for unjust enrichment resulting from the

detriment suffered by Plaintiff and the benefits received and appreciated by

Defendants; and

4.      Awarding Cunningham Lindsey such other and further relief as this

Court may deem just and proper.

BUCHANAN INGERSOLL & ROONEY PC


/s/ *Jayson R. Wolfgang*
Jack M. Stover (PA ID No. 18051)
Jayson R. Wolfgang (PA ID No. 62076)
Jan L. Budman II (PA ID No. 203200)
Kyle J. Meyer (PA ID No. 307743)
409 North Second Street
Suite 500
Harrisburg, PA  17101-1357
Tel.:  (717) 237-4837
Facsimile:  (717) 233-0852
*jack.stover@bipc.com*
*jayson.wolfgang@bipc.com*
*jan.budman@bipc.com*
*kyle.meyer@bipc.com*


*Attorneys for Plaintiff Cunningham Lindsey
U.S., Inc.*

Dated:  July 18, 2014